Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| | | |
|---|---|---|
| **JESÚS DOMÍNGUEZ MORALES, et als.**<br><br>Apelados<br><br>v.<br><br>**MAURICIO HERNÁNDEZ ARROYO, et als.**<br><br>Apelantes | KLAN202300438 | **APELACIÓN**<br>Procedente del Tribunal de Primera Instancia, Sala Superior de Aibonito<br><br>Caso Núm.:<br>**B AC1995-0047** |
| **PUERTO RICO FARM CREDIT**<br><br>Demandante-Apelado<br><br>v.<br><br>**MAURICIO HERNÁNDEZ ARROYO, et als.**<br><br>Demandados | | Caso Núm.:<br>**B CD1999-0240**<br><br>Sobre: Sentencia Declaratoria Cumplimiento Específico Daños y Perjuicios |

Panel integrado por su presidenta la juez Barresi Ramos, la jueza Rivera Pérez y el juez Pérez Ocasio

Pérez Ocasio, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 25 de abril de 2024.

Comparecen ante nos Mauricio Hernández Arroyo y Liselote Reyes Ocasio, en adelante, Hernández-Reyes o apelantes, solicitando que revisemos la *"Resolución"* del Tribunal de Primera Instancia, Sala Superior de Aibonito, en adelante, TPI-Aibonito, emitida el 13 de marzo de 2023 y notificada al día siguiente. Mediante este dictamen, el Foro Apelado ordenó el cierre y archivo con perjuicio, de la causa de acción que motivó el caso de epígrafe.

---

[1] Véase Orden Administrativa OATA-2023-131 del 14 de julio de 2023, donde se designa al Juez Alberto Luis Pérez Ocasio en sustitución de la jueza Sol de Borinquen Cintrón Cintrón.

Por los fundamentos que expondremos a continuación, *confirmamos* la determinación del TPI-Aibonito.

**I.**

Los hechos que dan curso a la controversia que hoy nos ocupa, tuvo su génesis en el año 1993, hace treinta (30) años atrás, cuando los apelantes deciden comprarle unas cuerdas de terreno a Jesús Domínguez Morales y Margarita Figueroa Burgos, en adelante, Domínguez-Figueroa o apelados, en el Municipio de Orocovis. En el año 2005, este Tribunal emitió una *"Sentencia"* con relación a este caso.[2] Por entender que la misma cuenta con una completa recopilación de los hechos relevantes hasta ese momento, adoptamos los mismos en este dictamen:

> [E]l 29 de marzo de 1993 los esposos Domínguez-Figueroa y los esposos Hernández-Reyes otorgaron un denominado *Contrato de Opción de Compraventa.* Mediante el mismo, los esposos Domínguez-Figueroa se comprometieron a vender a los esposos Hernández-Reyes por el precio de $240,000 la propiedad que se describe a continuación:
>
>> RUSTICA: Situada en el Barrio "Ala de la Piedra" término municipal de Orocovis, con una cabida superficial de 399.00 cuerdas, y en lindes: por el Norte, con José Doel Domínguez Morales y Jesús Domínguez Morales; por el Sur, con el Río Doña Juana y terrenos de Julia Rivera y Sucesión Villafañe; por el Este, con la Quebrada denominada Bardío que divide terrenos de José Doel Domínguez Morales, y por el Oeste, con el Río Bauta que divide la jurisdicción de Ciales y Orocovis. Contiene un edificio de concreto dedicado a procesar café.
>> Inscrita al folio 72 del Tomo 153 de Orocovis, finca número 10,009.
>
> Posteriormente, las partes otorgaron un segundo contrato de opción de compraventa, cuya única modificación fue extender el plazo para ejercer la opción.
>
> Luego de varios incidentes y de que los compradores gestionaran la aprobación de un préstamo hipotecario, la Puerto Rico Farm Credit, entidad que concedería el financiamiento, pautó el otorgamiento de

---

[2] Apéndice del recurso, págs. 81-100.

las escrituras de compraventa y de hipoteca para el 20 de diciembre de 1993. Para ello le suministró todos los datos a la notari[a] designada para preparar las escrituras y demás documentos de cierre y citó a todas las partes para el otorgamiento.

Llegado el día del otorgamiento y después que los otorgantes leyeron la escritura, los esposos Domínguez-Figueroa se percataron que la descripción del inmueble que aparecía en las escrituras no era la que figuraba en el contrato de opción, sino que aparecía la descripción de la totalidad de su finca, la cual según sus títulos, es la siguiente:

> RUSTICA: Finca denominada "El Labrador" situada en el Barrio Ala de la Piedra del término municipal de Orocovis, Puerto Rico, con una cabida superficial de CUATROCIENTOS VEINTICUATRO CUERDAS CON SEIS MIL CIENTO SETENTICUATRO DIEZMILESIMAS DE OTRA (424.6174 cdas.) equivalentes a UN MILLON NOVENTA METROS CUADRADOS (1.668,911.90 m/c), conteniendo edificaciones y maquinarias; y en lindes por el NORTE, con José Víctor Figueroa y solares segregados; al SUR, con el Río Doña Juana, Terrenos de Julia Rivera, la Sucesión Villafañe y solares segregados; al ESTE, con la Quebrada denominada "Baldíes" que divide terrenos de José Víctor Figueroa; y al OESTE, con el Río Bauta que divide la jurisdicción de Ciales y Orocovis y Solares Segregados.
> Enclava en dicha propiedad edificio de Sesentidos pies por Treinta pies (62' X 30') de tres plantas dedicado a procesadora de café.
> Es el remanente de la finca número Mil Nueve (1009) inscrita al folio Setentidos (72) del tomo Ciento Cincuentitres (153) de Orocovis.

Resulta que, aunque era de su conocimiento, en ningún momento la Puerto Rico Farm Credit le informó a la notari[a] que el objeto de la compraventa eran sólo *399 cuerdas* y no la totalidad de la finca, y que la segregación de las 25 cuerdas aún estaba pendiente. En consecuencia, las escrituras fueron preparadas conforme a los títulos existentes. Al ser requeridos por la notari[a], los esposos Domínguez-Figueroa le informaron que no contaban con la correspondiente autorización de segregación expedida por la Administración de Reglamentos y Permisos (A.R.P.E.). Como solución al problema surgido, las partes acordaron otorgar las escrituras según redactadas, es decir, con la descripción de la totalidad de la finca (424.6174 cuerdas), para posteriormente proceder con

la segregación y el otorgamiento del título de las 25 cuerdas que retendrían los esposos Domínguez-Figueroa. A tales efectos, en esa misma fecha, los esposos Hernández-Reyes suscribieron un documento privado que expresa, textualmente:

Nosotros, MAURICIO HERNÁNDEZ ARROYO Y LISELOTE REYES OCASIO, nos comprometemos con el SR. JESÚS DOMÍNGUEZ MORALES Y MARGARITA FIGUEROA BURGOS, de otorgarle escritura de segregación de 25 cuerdas de la finca que éstos nos vendieran 424.6174 cuerdas, ya que los señores DOMÍNGUEZ FIGUEROA, nos vendieron 398.454 cuerdas; las cuales quedarán a nombre de éstos como finca ~~aparte~~ parte, de la cual nosotros no tendremos ningún título.[3]

Así las cosas, el 1 de abril de 1995, los esposos Domínguez-Figueroa presentaron ante el TPI una demanda sobre sentencia declaratoria y cumplimiento específico contra los esposos Hernández-Reyes y la Puerto Rico Farm Credit. Alegaron, que a pesar de los trámites realizados aún no se les había otorgado la escritura de las 25 cuerdas que les pertenecen y que la Puerto Rico Farm Credit no había liberado las mismas del gravamen constituido a su favor por los esposos Hernández-Reyes, según pactado. Solicitaron que se decretara la nulidad del contrato de compraventa y que se ordenase el otorgamiento de la correspondiente escritura de segregación, compraventa y liberación de las 25 cuerdas.

Los esposos Hernández-Reyes negaron las alegaciones de los demandantes, esposos Domínguez-Figueroa, y alegaron, por vía de defensa afirmativa, que éstos nunca realizaron gestión alguna con ellos para segregar la finca como acordaron. Reconvinieron por alegados daños sufridos. La Puerto Rico Farm Credit, también negó las alegaciones de los esposos Domínguez-Figueroa, y alegó, por vía de defensa afirmativa, que ellos habían actuado conforme a sus procedimientos internos para la concesión de préstamos; y, que si los esposos Hernández-Reyes incumplieron con el contrato se debió única y

---

[3] No surge de autos de dónde fue obtenida la cabida de 398.454 cuerdas que expresan los esposos Hernández-Reyes en cuanto a la finca que les fue vendida. Pues, al restar 25 cuerdas del total de 424.6174 cuerdas, el balance correcto es 399.6174 cuerdas. (Esta es la nota al calce que surge del caso citado).

exclusivamente a la culpa de éstos y/o a situaciones fuera del control de dicha agencia. A su vez, presentó demanda de tercero contra la notaria autorizante de las escrituras de compraventa y de hipoteca.

Luego de los trámites procesales correspondientes, el TPI declaró la nulidad de la escritura de compraventa y acogió la solicitud de liberación de hipoteca en cuanto al predio a ser retenido por los esposos Domínguez-Figueroa. Además, sostuvo la validez de la obligación contraída entre las partes en el *Contrato de Opción de Compraventa,* "y por tanto 'Ha Lugar' la solicitud de sentencia declaratoria donde se establece que los demandantes [esposos Domínguez-Figueroa] son los dueños de un remanente de 25.6174 cuerdas de terreno de la finca objeto de esta acción."[4] Asimismo decretó que "la parte demandada debe honrar su compromiso contractual de aceptar la segregación practicada por la parte demandante".

No conformes, los esposos Hernández-Reyes acudieron ante este Tribunal mediante el recurso KLAN199800240, alegando entre varios errores, que el TPI no había emitido decisión alguna en cuanto a la colindancia disputada por las partes.

Luego de los trámites procesales correspondientes, mediante la sentencia emitida el 30 de septiembre de 1998 en el KLAN199800240, este Foro modificó la sentencia apelada y devolvió el caso al TPI para que luego de celebrar vistas evidenciarias, dicho Foro se expresara sobre: (1) la identificación y descripción de la finca a segregarse; (2) el término para llevar a cabo la segregación; (3) el término para otorgar la escritura de segregación y compraventa de la finca de 398.454 cuerdas; y (4) determinar a quien corresponde la posesión de la finca a segregarse y su remanente hasta tanto se obtengan los permisos de A.R.P.E.

---

[4] Conforme a la cabida de 25.6174 cuerdas que el TPI adjudicó al predio a ser retenido por los esposos Domínguez-Figueroa, el restante terreno quedaría con una cabida de 399 cuerdas, lo cual concuerda con el contrato de opción de compra otorgado entre las partes. No obstante, tanto las partes como el TPI validaron durante el transcurso de todo el proceso que el predio adquirido por los esposos Hernández-Reyes tiene una cabida de 398.454 cuerdas. (Esta es la nota al calce que surge del caso citado).

La aludida sentencia expresa textualmente, en lo pertinente, lo siguiente:

Ahora bien, la sentencia apelada no hace expresión sobre la identificación y descripción de la finca a segregarse. Tampoco dispone sobre el término para llevarse a cabo la segregación acordada. A los fines de establecer y adjudicar lo que corresponda sobre esos extremos y aquellos otros complementarios, atinentes y pertinentes para completar la transacción, conforme lo que sobre el particular hayan pactado las partes o que surjan del acuerdo, incluyendo su fecha de efectividad, todo lo cual carecemos en estos momentos de los elementos necesarios, deberá el foro de instancia celebrar las vistas evidenciarias que determine. De no haber establecido las partes término alguno para otorgar la escritura de segregación y compraventa de las trescientas noventa y ocho punto cuatrocientas cincuenta y cuatro (398.454) cuerdas, se entenderá que dicha autorización constituye una condición suspensiva para que perfeccionen y consuman los acuerdos pactados sin demora innecesaria. Igualmente resulta menester que el foro de instancia determine lo relacionado con la posesión de la parcela a segregarse y del remanente de la finca hasta que se obtenga el permiso para la segregación conforme lo que las partes acordaron sobre el particular. En su consecuencia, devolvemos el caso al tribunal apelado a los fines de que continúe con los procedimientos en este caso y disponga lo que proceda adjudicar sobre los extremos aducidos de forma compatible con lo aquí resuelto.

A tales fines el TPI celebró vistas evidenciarias los días 6 de julio de 2001 y 1 de noviembre del mismo año. En estas vistas el Tribunal tuvo la oportunidad de escuchar los testimonios presentados por cada una de las partes. Una vez concluidas las vistas, el 21 de junio de 2002 dicho foro dictó sentencia. En la misma dispuso, en lo relacionado a la identificación y descripción de la finca a segregarse, como sigue:

El Tribunal concede total validez al plano de mensura preparado por el agrimensor Don Pastor Vázquez Montes (cita exhibit) y adjudica el predio identificado con la letra "D" al demandante Don Jesús Domínguez Morales y su esposa Margarita Figueroa Burgos. Así mismo mantenemos la validez de las segregaciones que deberán efectuarse para los lotes identificados A, B y C del referido plano. La cabida resultante y que se identifica como "Finca Principal" le es adjudicada a los demandados Don Mauricio Hernández y Doña [Liselote] Reyes Ocasio.

En cuanto a la formalización de la segregación el TPI concedió un período de 30 días para que los esposos Domínguez-Figueroa sometieran, a su costo, ante la consideración de A.R.P.E. el plano de segregación preparado por el agrimensor Vázquez; y que, una vez se

obtuviera la aprobación de A.R.P.E. se procediera a otorgar, en el término de 30 días, la escritura de segregación y compraventa, conforme al negocio jurídico entre ellos convenido.

En cuanto a la posesión de la parcela a segregarse y del remanente de la finca, dispuso que "la posesión de la parcela identificada con la letra "D" en el plano levantado corresponde al demandante Don Jesús Domínguez y su esposa y que el remanente de la finca, descontando los lotes A, B y C, corresponde a los demandados Don Mauricio Hernández y su esposa [Liselote] Reyes Ocasio".

En adición dispuso, que en la eventualidad de que la cabida a ser retenida por los compradores resultara distinta como resultado de las segregaciones, se hicieran los ajustes necesarios en el precio de compraventa.

Inconformes, Hernández-Reyes recurrió nuevamente a esta Curia, alegando que el Foro Primario incumplió con el mandato de este Tribunal. En su *"Sentencia"* del 2005, el Tribunal de Apelaciones revocó al Foro Primario, determinando que la labor del Agrimensor solo midió las veinticinco (25) cuerdas de los vendedores, lo cual era contrario a lo que había ordenado. Indicó que lo que los vendedores tenían que segregar eran las 398.454 cuerdas de los vendedores.[5]

El 5 de octubre de 2006, Puerto Rico Farm Credit solicitó que se señalara una vista para discutir el estado del caso.[6] Luego de celebrar una vista el 12 de diciembre de 2006,[7] el TPI-Aibonito emitió ~~una~~ *"Resolución"* el 5 de febrero de 2007.[8] En ella estableció unas instrucciones para las partes, a fin de cumplir con el mandato de este Tribunal del 20 de abril de 2006 – producto de la *"Sentencia"*

---

[5] Apéndice del recurso, pág. 81.
[6] *Id.* pág. 101.
[7] *Id.* pág. 110.
[8] *Id.* pág. 107.

del 30 de diciembre de 2005.[9] En su dictamen, el TPI-Aibonito dispuso lo siguiente:

1. Domínguez-Figueroa tendría treinta (30) días para notificarle a Hernández-Reyes al menos dos (2) nombres de posibles agrimensores, distinto al que tenían, junto con sus cualificaciones.

2. Luego de que se cumpliera con la primera orden, Hernández-Reyes tendría quince (15) días para informar sus objeciones. De tener alguna, debían proponer un sustituto.

3. Luego de que estos últimos presentaran sus objeciones, si alguna, Domínguez-Figueroa tendría quince (15) días para contratar finalmente al perito.

Luego de estos casi veinte (20) años, desde que el Foro Primario emitió la mencionada *"Resolución",* las partes, mayormente forzadas por los apelantes, incurrieron en un tortuoso y largo litigio, que tuvo el efecto de dilatar innecesariamente la adjudicación de la controversia. Durante años, se presentaron decenas de mociones para oponerse,[10] objetar o exponer posición,[11] replicar o aclarar,[12] solicitar sanciones,[13] solicitar reconsideración,[14] solicitar prórrogas,[15] notificar alegados incumplimientos,[16] entre otras. Es por esto que, este Tribunal solo se referirá a los eventos procesales del caso que sean relevantes a la controversia que se nos plantea.

Establecida la precitada salvedad, continuamos la exposición de hechos relevantes con el *"Escrito Informativo y Solicitud de Orden",* de Hernández-Reyes del 21 de mayo de 2007, en la que los apelantes alegaron que no habían podido cumplir con las directrices del Foro Primario del 20 de diciembre de 2005, porque el

---

[9] Apéndice del recurso, págs. 107-109.
[10] *Id.* págs. 194, 197, 211, 336, 575, 724, 807, 886, 925, 1088, 1103, 1124, 1144, 1153, 1198.
[11] *Id.* págs. 564, 635, 638, 712, 724, 751, 817, 861, 1167.
[12] *Id.* pág. 464, 873, 879, 886, 917, 952, 954, 964, 1086, 1091, 1129.
[13] *Id.* págs. 205, 220, 724, 865, 867, 917.
[14] *Id.* págs. 486, 681, 849, 1182.
[15] *Id.* págs. 211, 228, 273, 325, 336, 345, 764, 772.
[16] *Id.* págs. 121, 205, 211, 220, 279, 428, 881, 986.

incumplimiento de Domínguez-Figueroa con su parte los mantenía restringidos.[17] Esto, ya que Domínguez-Figueroa anunció sus candidatos para el perito agrimensor, sin especificar las cualificaciones de estos, como lo ordenó el TPI-Aibonito. Arguyeron que esto les impedía reaccionar a los candidatos propuestos.

El 10 de marzo de 2008, el Foro Primario emitió una orden en la que indicó que, por el incumplimiento y la pobre comunicación entre los abogados de las partes para la selección del perito y mensura, estos quedaban bajo apercibimiento de sanciones, si no cumplían finalmente.[18]

Mediante *"Resolución y Orden Enmendada en Caso BAC1995-0047"*, del 16 de agosto de 2013, el TPI-Aibonito indicó que la inscripción de la finca en cuestión se hizo mediante una escritura pública que posteriormente fue anulada por una sentencia que ya era final, firme e inapelable.[19] El Foro Primario razonó que de no corregirse la incongruencia entre el Registro de la Propiedad y la realidad extra registral, no podría cumplir con el mandato del Tribunal de Apelaciones, en el cual se le ordenó completar la mensura y segregación de la finca aludida. Por todo lo cual, el Foro Apelado ordenó que se cancelara la inscripción hecha en el Registro de la Propiedad sobre la finca objeto del litigio, y que se mantuviera la titularidad de la misma a favor de Domínguez-Figueroa.

Posteriormente, el 13 de mayo de 2015, Domínguez-Figueroa presentó una *"Moción en Cumplimiento de Orden Sobre Estado de Petición ante la O.G.P.E."*, mediante la cual informó que, al momento, solo restaba esperar la aprobación de la segregación de la Oficina de Gerencia de Permisos, en adelante, OGPe.[20]

---

[17] Apéndice del recurso pág. 121.
[18] *Id*. pág. 146.
[19] *Id*. pág. 387.
[20] *Id*. pág. 430.

Después de poco más de un año, Domínguez-Figueroa le informó al Foro Primario, mediante moción del 15 de julio de 2016, que la determinación de la Oficina de Gerencia de Permisos, con relación a la segregación de la finca en cuestión, ya advino final y firme.[21] A esta moción se le adjuntó una propuesta de servicios profesionales del Lcdo. Colón Ortiz, con relación a la preparación y otorgación de la escritura de segregación.[22] Más adelante, mediante orden del 9 de noviembre de 2016, el Foro Primario aprobó la propuesta y designó al Lcdo. Colón Ortiz como el notario que otorgaría las referidas escrituras.[23]

Durante los próximos cinco (5) años, las partes continuaron el litigio. El mismo incluyó los siguientes eventos procesales:

1. Los apelantes solicitaron una vista antes de que se ordenara el cierre del caso, y expusieron una serie de objeciones a la propuesta de segregación aprobada por el TPI-Aibonito. Las mismas fueron presentadas en destiempo, en el año 2016.[24]

2. Los apelantes presentaron una *"Moción de Reconsideración"* a la orden del 9 de noviembre de 2016.[25] La misma fue denegada el 3 de enero de 2017.[26]

3. Los apelados presentaron una *"Moción Sobre Varios Asuntos Procesales del Caso"*, el 11 de abril de 2017, en la que plantearon que habían cumplido con las órdenes del Foro Apelado, a los fines de pagar su parte de los honorarios al notario. Además, informaron que el abogado-notario asignado ya había redactado el borrador de la escritura de compraventa. Sin embargo, expusieron que los apelantes no habían cumplido con el pago de honorarios que les correspondía. Por ello, alegaron que estos últimos, de manera temeraria, solo buscaban retrasar el fin del caso. Finalmente, le

---

[21] Apéndice del recurso, pág. 610.
[22] *Id.* pág. 613.
[23] *Id.* pág. 629.
[24] *Id.* pág. 632.
[25] *Id.* pág. 681.
[26] *Id.* pág. 718.

solicitaron al TPI-Aibonito que les impusiera sanciones, y de ser necesario, ordenara la comparecencia del Alguacil del Tribunal en representación de los apelantes, a la firma de la escritura.[27]

4. En respuesta a la precitada moción, los apelantes radicaron una *"Moción Sometiendo Objección [sic] de Moción Sobre Varios Asuntos Procesales del Caso y Solicitud de Sanciones y Auxilio de Jurisdicción"*, el 9 de mayo de 2017.[28] En la misma, alegaron, como hicieron en innumerables veces anteriores, que no habían recibido las mociones de la otra parte. Volvieron a exponer una serie de objeciones, replicaron a la moción precitada de los apelados. Finalmente, solicitaron un "cese y desista" contra los apelados, para que estos no se apoderaran más "de los terrenos de la parte demandante hasta que este caso sea final y firme".[29] Resaltamos que, al final de su petitorio/réplica/auxilio, los apelantes expresaron que "[e]ste caso se va a apelar por todos los incumplimientos y deben mantener el *status quo* como desde 1993 hasta que haya una sentencia final y firme".[30]

5. El 16 de mayo de 2017, el Foro Primario emitió dos notificaciones. En la primera, dio por cumplida la moción de los apelados del 11 de abril de 2017.[31] Con relación a la segunda, les expuso a los apelantes, que, así como se le había indicado en órdenes pasadas, la responsabilidad de comunicarse y resolver los problemas de notificación recaía sobre los abogados de las partes. Finalmente, le dio diez (10) días a la parte apelada para expresarse en cuanto a lo demás.[32]

6. El 29 de agosto de 2017 y el 8 de enero de 2018, el TPI-Aibonito notificó órdenes, dándole a las partes diez (10) días para coordinar y confirmar la fecha

---

[27] Apéndice del recurso, pág. 720.
[28] *Id.* pág. 724.
[29] *Id.* pág. 728.
[30] *Id.* pág. 729.
[31] *Id.* pág. 730.
[32] *Id.* pág. 732.

para el otorgamiento de las escrituras sobre la finca en cuestión.[33]

7. Los apelantes presentaron una moción objetando la orden del Foro Apelado del 29 de agosto de 2017, la cual fue denegada mediante una *"Resolución y Orden",* el 26 de enero de 2018.[34] En su dictamen, el TPI-Aibonito indicó que el tiempo para oponerse a la orden de agosto de 2017 había vencido el 11 de septiembre de 2017. Reiteró que en los meses que le siguieron, nada hicieron los apelantes, hasta ese momento, cuando se recabó la misma mediante la orden de enero del año 2018. Aprovechó el Foro Primario la coyuntura para reiterar que "[t]ras un prolongado historial de incumplimientos y de planteamientos que han dilatado la culminación" del caso, tan atrás como el 9 de noviembre de 2016, el Tribunal había emitido una orden en la que detalló los pasos a seguir para otorgar las nuevas escrituras.[35] Finalmente, les concedió a las partes treinta (30) días para completar los trámites correspondientes, y acreditarlo al Tribunal.

8. El 23 de abril de 2018, los apelados presentaron prueba al Foro Primario de los esfuerzos llevados a cabo para cumplir con la precitada orden del 26 de enero de 2018, y coordinar la fecha para el otorgamiento de escrituras.[36] Indicaron que, a esa fecha, no habían recibido respuesta.

9. El 3 de mayo de 2018, el TPI-Aibonito recibió una moción informativa de quien era la representación legal de los apelantes, indicando que al momento, estos se encontraban sin representación legal, ya que el Tribunal Supremo de Puerto Rico había revocado la licencia del abogado suscribiente.[37] En respuesta, el Foro Primario le concedió a los apelantes treinta (30) días para notificar nueva representación legal.[38] Sin embargo, luego de solicitar dos (2) prórrogas para adquirir nueva

---

[33] Apéndice del recurso, págs. 735-740.
[34] *Id.* pág. 741.
[35] *Id.* pág. 743.
[36] *Id.* pág. 747.
[37] *Id.* pág. 748.
[38] *Id.* pág. 758.

representación legal, el Foro Primario emitió una *"Resolución"* el 27 de julio de 2018.[39] En su dictamen, indicó el Tribunal que considerando "el historial del caso, y que lo que queda pendiente es el otorgamiento de escritura" ordenó a los apelados que enviaran en diez (10) días los proyectos de escritura.[40] Además, concedió veinte (20) días a los apelantes para informar sus inquietudes sobre el texto de las escrituras "que no se refieran a las controversias que ya fueron resueltas y adjudicadas en este caso".[41]

10. El 13 de septiembre de 2018, los apelantes presentaron dieciséis (16) objeciones a los proyectos de escritura.[42]

11. El 17 de octubre de 2018, Puerto Rico Farm Credit presentó una moción que describió como "deprimente y desmoralizante tener que estar radicando mociones como la presente",[43] en la que planteó, entre otras cosas, que considerando que una de las partes demandantes – aquí el apelante – es abogado, le resultaba inverosímil la cantidad de tiempo que el Foro Primario le había concedido para adquirir representación. Además, hizo varios señalamientos al Foro Primario sobre su falta de asertividad en el manejo del caso.[44]

12. Sin embargo, una vista fue programada para el 10 de diciembre de 2018.[45] Mediante moción, los apelantes informaron que no podrían comparecer a la misma.[46] Por ello, la vista se recalendarizó para el 9 de enero de 2019.[47] La misma no fue celebrada hasta el 12 de febrero de 2019.[48]

13. Durante el año 2019, la apelante presentó nuevas mociones oponiéndose, nuevamente y en destiempo, a las mensuras y la propuesta de las escrituras.[49]

---

[39] Apéndice del recurso, pág. 780.
[40] *Id.* pág. 780.
[41] *Id.*
[42] *Id.* pág. 786.
[43] *Id.* pág. 797.
[44] *Id.*
[45] *Id.* pág. 801.
[46] *Id.*
[47] *Id.* pág. 806.
[48] *Id.* pág. 849.
[49] *Id.* pág. 807.

También presentó moción reiterando el "cese y desista" previamente solicitado.[50]

14. El 5 de abril de 2021, luego de que el Foro Primario emitiera una *"Resolución y Orden",* los apelantes solicitaron otra reconsideración.

15. El 14 y 29 de diciembre de 2021, los apelantes presentaron mociones planteando los mismos argumentos que por años estuvieron impulsando sin éxito y en destiempo, y para solicitar sanciones a la otra parte y al Lcdo. Colón Ortiz. El Foro Apelado, el 17 de diciembre de 2021, contestó una de estas, e indicó lo siguiente: "NO HA LUGAR. [...] EL TRIBUNAL NO VA A PERMITIR QUE LOS DEMANDADOS SIGAN BUSCANDO RAZONES PARA RETRASAR EL OTORGAMIENTO CUANDO HAN ATENIDO [sic] POR MUCHO TIEMPO OPORTUNIDADES DE ESTUDIAR LOS DOCUMENTOS QUE DAN BASE A LAS ESCRITURAS Y LOS PROYECTOS NOTIFICADOS POR EL NOTARIO".[51]

Así las cosas, el 17 de diciembre de 2021, el licenciado-notario Colón Ortiz presentó una *"Moción al Expediente Judicial"* en la que informó al Foro Primario que había enviado a todas las partes los tres (3) proyectos de escrituras.[52] Según surge de *"Moción Informativa"* radicada por el licenciado-notario Colón Ortiz el 23 de diciembre de 2021, el 21 de diciembre de 2021 comparecieron a la Sala de Jurado del Centro Judicial de Aibonito para el otorgamiento de las escrituras.[53] Adujo que los demandados, aquí apelantes, se negaron a firmar las mismas.[54] A su moción adjuntó el "Acta" exponiendo lo acontecido.[55]

Luego de otros incidentes y controversias procesales entre las partes, el 17 de junio de 2022, la escritura de compraventa fue

---

[50] Apéndice del recurso, pág. 807.
[51] *Id.* pág. 906.
[52] *Id.* pág. 905.
[53] *Id.* pág. 908.
[54] *Id.*
[55] *Id.* pág. 910.

finalmente otorgada.[56] Sin embargo, surge de la *"Moción de Cierre Administrativo"* del 22 de junio de 2022, presentado por los apelados, que la apelante Reyes se negó a firmar, y el apelante Hernández no compareció.[57] Por ello, el Alguacil Juan Burgos Burgos es el que finalmente firma en la escritura.[58]

Inconforme, el apelante presentó una oposición al cierre administrativo el 4 de julio de 2022.[59] Por su parte, el 23 de diciembre de 2022, los apelados presentaron una *"Segunda Moción de Cierre Administrativo"*,[60] a la que se opuso, nuevamente, el apelante el 4 de enero de 2023.[61]

Finalmente, el 13 de marzo de 2023, el TPI-Aibonito, mediante *"Resolución"*, declaró "Ha Lugar" el cierre administrativo del caso de epígrafe.[62] El apelante solicitó una reconsideración al cierre administrativo del caso, el 21 de marzo de 2023. Puerto Rico Farm Credit se opuso a la reconsideración el 6 de abril de 2023.[63] La *Moción en Cumplimiento de Orden* presentada por las partes apeladas en la cual se opusieron a la solicitud de reconsideración fue declarada "Con Lugar" por el Foro Apelado el 14 de abril de 2023.[64]

Inconformes, los apelantes recurrieron ante esta Curia el 17 de mayo de 2023 mediante un recurso de apelación. En el mismo hacen los siguientes señalamientos de errores:

> ERRÓ EL HONORABLE TRIBUNAL AL DECLARAR QUE EL TRIBUNAL DE APELACIONES EN KLAN0200906 CONFIRMÓ LA SEGUNDA SENTENCIA Y EN EMITIR UNA RESOLUCIÓN Y ORDEN EL 16 DE AGOSTO DE 2013.
>> A) NO HAY SENTENCIA FINAL Y FIRME.

---

[56] Apéndice del recurso, pág. 1134.
[57] *Id.* pág. 1142.
[58] *Id.* pág. 1151.
[59] *Id.* pág. 1153.
[60] *Id.* pág. 1161.
[61] *Id.* pág. 1169.
[62] *Id.* pág. 1181.
[63] *Id.* pág. 1198.
[64] *Id.* pág. 1202.

ERRÓ EL HONORABLE TRIBUNAL EN VIOLAR LOS DERECHOS DE LA PARTE APELANTE DE SU DEBIDO PROCESO DE LEY AL NO PERMITIRLE PRESENTAR SU ÚLTIMO INFORME PERICIAL Y AL NO CELEBRAR VISTA EVIDENCIARIA ALGUNA.

ERRÓ EL HONORABLE TRIBUNAL EN VIOLAR LOS DERECHOS DE LA PARTE APELANTE AL DEBIDO PROCESO DE LEY, AL NO PERMITIRLE PRESENTAR SUS DEFENSAS, RECONVENCIÓN Y DEMANDA CONTRA CO-PARTE.
ERRÓ EL HONORABLE TRIBUNAL AL DECLARAR CIERRE ADMINISTRATIVO Y DE NO EMITIR UNA SENTENCIA FINAL Y FIRME.

ERRÓ EL HONORABLE TRIBUNAL Y ABUSÓ SU DISCRECIÓN CUANDO ORDENÓ LA PARTE APELANTE RETIRAR SU PARTICIPACIÓN EN PROCEDIMIENTOS ADMINISTRATIVOS EN OGPE E IMPONIENDO $500 SANCIONES.

ERRÓ EL HONORABLE TRIBUNAL AL NO ASEGURAR QUE LOS DEMANDANTES CUMPLIERAN CON LOS MANDATOS DEL TRIBUNAL DE APELACIONES LAS RESOLUCIONES Y ÓRDENES DEL TRIBUNAL DE PRIMERA INSTANCIA Y NO REVISAR DOCUMENTOS SOMETIDO[S] Y RECIBIDOS DE LA OGP PERMITIENDO QUE LOS APELADOS UNILATERALMENTE ESTABLECIERA[N] NUEVAS COLINDANCIAS.

ERRÓ EL HONORABLE TRIBUNAL EN ORDENAR FIRMAS INVOLUNTARIAS DE ESCRITURAS QUE NO ERA EL NEGOCIO JURÍDICO Y LO ACORDADO ENTRE LAS PARTES.

El 2 de junio de 2023, los apelados presentaron una *"Moción de Desestimación"*. Los apelantes replicaron a la moción de desestimación el 14 de junio de 2023. Unos días después, el 26 de junio de 2023, los apelantes presentaron una *"Notificación de Desestimación Voluntaria contra la Parte Apelado Puerto Rico Farm Credit, A.C.A."*.

Finalmente, el 13 de julio de 2023, la parte apelada presentó su *"Oposición a la Apelación"*. El 4 de agosto de 2023, la parte apelante replicó al alegato en oposición de la parte apelada.

Con el beneficio de los escritos de las partes, estamos en posición de resolver la controversia ante nos.

**II.**

**A. Revisión Judicial**

Al revisar una determinación de un foro de menor jerarquía, los tribunales revisores tenemos la tarea principal de auscultar si se aplicó correctamente el derecho a los hechos particulares del caso. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). Como regla general, los foros apelativos no tenemos facultad para sustituir las determinaciones de hechos del tribunal de instancia con nuestras propias apreciaciones. *Dávila Nieves v. Meléndez Marín*, supra, pág. 771; *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2007). De manera que, si la actuación del tribunal no está desprovista de base razonable, ni perjudica los derechos sustanciales de una parte, debe prevalecer el criterio del juez de instancia a quien corresponde la dirección del proceso. *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414 (2013); *Sierra v. Tribunal Superior*, 81 DPR 554, 572 (1959).

Sin embargo, la norma de deferencia esbozada encuentra su excepción y cede cuando la parte promovente demuestra que hubo un craso abuso de discreción, prejuicio, error manifiesto o parcialidad. *BBPR v. Gómez Alayón y otros*, 2023 TSPR 145, 213 DPR ___ (2023); *W.M.M., P.F.M. et al. v. Colegio et al.*, 211 DPR 871, 902-903 (2023); *VS PR, LLC v. Drift-Wind*, 207 DPR 253, 273 (2021); *Trans-Oceanic Life Ins. v. Oracle Corp.*, 184 DPR 689, 709 (2012). Además, se requiere que nuestra intervención en esta etapa evite un perjuicio sustancial. *Rivera et al. v. Arcos Dorados et al.*, 2023 TSPR

65, 212 DPR ___ (2023); *Lluch v. España Service Sta.*, 117 DPR 729, 745 (1986).

Por discreción se entiende el "tener poder para decidir en una forma u otra, esto es, para escoger entre uno o varios cursos de acción". *García v. Asociación*, 165 DPR 311, 321 (2005), citando a *Pueblo v. Ortega Santiago*, 125 DPR 203, 211 (1990). No obstante, "el adecuado ejercicio de la discreción está inexorable e indefectiblemente atado al concepto de la razonabilidad". *Id*. A esos efectos, el Tribunal Supremo de Puerto Rico ha indicado cuáles son situaciones que constituyen un abuso de discreción, a saber:

> [C]uando el juez, en la decisión que emite, no toma en cuenta e ignora, sin fundamento para ello, un hecho material importante que no podía ser pasado por alto; cuando por el contrario el juez, sin justificación y fundamento alguno para ello, le concede gran peso y valor a un hecho irrelevante e inmaterial y basa su decisión exclusivamente en el mismo; o cuando, no obstante considerar y tomar en cuenta todos los hechos materiales e importantes y descartar los irrelevantes, el juez livianamente sopesa y calibra los mismos.
>
> *Ramírez v. Policía de P.R.*, 158 DPR 320, 340-341 (2002), citando a *Pueblo v. Ortega Santiago*, supra, págs. 211-212.

Así, pues, la discreción no implica que los tribunales puedan actuar de una forma u otra en abstracción del resto del derecho. *BBPR v. Gómez Alayón y otros,* supra; *Rivera et al. v. Arcos Dorados et al.*, supra.

### B. Debido Proceso de Ley

La Constitución de Puerto Rico reconoce una serie de derechos, incluido entre estos el debido proceso de ley. Const. ELA, Art. II, 1 LPRA sec. 7. Esta garantía tiene dos (2) vertientes – la sustantiva y la procesal. La vertiente sustantiva del debido proceso de ley busca proteger los derechos fundamentales de la persona, mientras que la vertiente procesal le impone al Estado la obligación de garantizar un proceso justo y equitativo cuando se interfiera con los intereses de libertad y de propiedad del individuo. *Fuentes Bonilla v. ELA et al.*, 200 DPR 364, 394 (2018); *Domínguez Castro et al. v. E.L.A. I*, 178 DPR 1, 35 (2010). La jurisprudencia normativa ha

identificado componentes básicos del debido proceso de ley, tales como una notificación adecuada y la oportunidad de ser escuchado y de defenderse. *Pueblo v. Pagán Rojas et al.,* 187 DPR 465, 480 (2012); *Garriga Villanueva v. Mun. San Juan,* 176 DPR 182, 197 (2009).

Sobre la vertiente procesal, nos dice el Tribunal Supremo que esta le impone al Estado la obligación de garantizar que la interferencia con los intereses de libertad y de propiedad del individuo solo ocurra mediante un proceso justo y equitativo. Esta protección se activa cuando existe un interés individual de libertad o de propiedad. *Pueblo v. Montero Luciano,* 169 DPR 360, 371 (2006); *Rafael Rosario & Assoc. v. Dpto. Familia,* 157 DPR 306, 330 (2002).

### C. Regla 51.3 de Procedimiento Civil

Si bien de ordinario son las partes contratantes las que suscriben un documento o instrumento para obligarse mediante su consentimiento voluntario, nuestro ordenamiento reconoce circunstancias especiales en las que una persona puede obligar a otra suscribiendo una obligación con un tercero.

Nuestras Reglas de Procedimiento Civil también consideran otro tipo de circunstancia en la que se permite que una persona, en este caso *un alguacil,* realice actos específicos, como otorgar una escritura, cuando se dicta sentencia ordenando la transmisión del dominio de terrenos. Sobre ello, la Regla 51.3 de Procedimiento Civil, 32 LPRA Ap. V, dispone como sigue, en lo pertinente a nuestro caso:

> (a) Cuando una sentencia ordene a una parte transferir el dominio de terrenos y otorgar escrituras y otros documentos, o realizar cualquier otro acto específico, y dicha parte no cumpla tal orden dentro del término especificado, *el tribunal podrá ordenar que otra persona por él designada realice el acto a expensas de la parte que incumple.* Cuando el acto haya sido realizado de este modo, tendrá el mismo efecto que si se hubiese ejecutado por la parte.
> (Énfasis nuestro).

### D. Sanciones

Sabido es que, aunque el ordenamiento jurídico favorece que los casos se ventilen en sus méritos de forma justa, económica y rápida, no significa que una parte adquiera el derecho a que su caso adquiera vida eterna en los tribunales, manteniendo a la otra en un estado de incertidumbre, sin más excusa para su falta de diligencia e interés en la tramitación del mismo que una escueta referencia a circunstancias especiales. *Mejías et al. v. Carrasquillo et al.,* 185 DPR 288, 298 (2012); *Mun. de Arecibo v. Almac. Yakima,* 154 DPR 217, 221-222 (2001); *Dávila v. Hosp. San Miguel, Inc.*, 117 DPR 807, 816 (1986).

Es harto conocido que los tribunales ostentan la autoridad de imponer sanciones a las partes de un caso, y a los abogados de estos. *Div. Empleados Públicos UGT v. CEMPR,* 2023 TSPR 107, 212 DPR ___ (2023). El Tribunal Supremo ha establecido que la imposición de sanciones es un remedio en contra de la congestión procesal en los tribunales, y un mecanismo para agilizar la resolución de las controversias. *Div. Empleados UGT v. CEMPR,* supra; *Lluch v. España Service Sta.*, supra, pág. 748.

Conforme lo anterior, *a iniciativa propia,* el tribunal puede "imponer sanciones cuando la conducta de las partes vaya en perjuicio de la eficiente administración de la justicia". *Lluch v. España Service Sta.*, supra, pág. 749.

El Tribunal Supremo, entre otras razones, explica que estas sanciones económicas tienen un efecto disuasivo para evitar las infracciones a las Reglas de Procedimiento Civil. *Mejías et al. v. Carrasquillo et al.*, supra, pág. 298; R. Hernández Colón, *Práctica jurídica de Puerto Rico: Derecho Procesal Civil*, 4ta Ed. San Juan, Ed. Lexis, 2007, pág. 181. Por último, y en lo que respecta a la imposición de sanciones como instrumentos para vindicar la

autoridad judicial, el tratadista José A. Cuevas Segarra, nos ilustra que:

> Las sanciones deben aplicarse con rigor para que **sirvan de manera ejemplarizante y como disuasivo**. Sólo cuando los tribunales comiencen a imponer sanciones adecuadas es que los litigantes y abogados que incurren en tácticas indebidas reevaluarán su técnica y enfoque en la litigación. [...] **Las dilaciones interminables e injustificadas en el cumplimiento del deber afirmativo de descubrir prueba comprometen los derechos básicos individuales y de la ciudadanía en general, y minan la confianza y fundamento de un sistema bajo el imperio de la ley**.
>
> J. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, 2011, 2da ed. Tomo III, Publicaciones JTS, pág. 1007.

Por otro lado, el informe recibido en la Legislatura sobre las Reglas de Procedimiento Civil, expone que las sanciones son "herramientas necesarias para **contrarrestar el creciente problema de la litigación frívola y los casos en que presentan un claro abuso del procedimiento por parte de los abogados, y las partes, con el consecuente costo y la dilación en los procedimientos**." *Informe de Reglas de Procedimiento Civil*, diciembre 2007, Tribunal Supremo de Puerto Rico, Secretariado de la Conferencia Judicial y Notarial, pág. 117.

A tenor con el espíritu legislativo de las sanciones, la Regla 44.2 de Procedimiento Civil, supra, establece, y la jurisprudencia así lo reitera, que "[e]l tribunal podrá imponer costas interlocutorias a las partes y **sanciones económicas, en todo caso y en cualquier etapa**, a una parte o a su representante legal por conducta constitutiva de demora, inacción, abandono, obstrucción o falta de diligencia en perjuicio de la eficiente administración de la justicia". *Pueblo v. Rivera Toro*, 173 DPR 137, 147 (2008).

Igualmente, el Art. 4.008 de la Ley de la Judicatura de 2003, 4 LPRA sec. 25, dispone que "el Tribunal de Apelaciones podrá imponer la sanción económica que estime apropiada cuando determine que el **recurso ante su consideración es frívolo, o que se presentó para retrasar los procedimientos**, [...] en perjuicio de la eficiente administración de la justicia". (Énfasis nuestro).

Por su parte, la Regla 85(B) del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, expone que si sus jueces "determina[n] que *el recurso ante su consideración es frívolo o que se presentó para dilatar los procedimientos, lo denegará[n] o desestimará[n], según sea el caso, e impondrá[n] a la parte promovente o a su abogado o abogada las costas, los gastos, los honorarios de abogado y la sanción económica que estime[n] apropiada*".

Por último, hacemos eco de las expresiones emitidas por el hoy ex-juez del Tribunal Supremo de Puerto Rico, Rebollo López en el año 1996:

> "[L]os tribunales de justicia no existen para la dilucidación de 'competencias deportivas' ni 'batallas de talento entre los abogados', en las cuales, de ordinario, prevalece el 'mejor de los gladiadores' o aquel que es el más 'hábil o listo'.
>
> La principal función del foro judicial lo es la búsqueda de la verdad, y el propósito primordial de los procedimientos que en el mismo se llevan a cabo lo constituye el que se le haga cumplida justicia a las partes que allí litigan las diferencias surgidas entre ellos. Ello exige —entre otros— *seriedad, buena fe y honestidad de parte de todos los que activamente participan en dichos procedimientos.*
>
> [...]
>
> [L]a litigación en nuestra jurisdicción no constituye una 'lidia deportiva' donde prevalece el más 'hábil y el más listo'. *Ante los tribunales de justicia de Puerto Rico se comparece de buena fe y, siempre, con la verdad. Aquel litigante o abogado que así no esté dispuesto a actuar, no importa quién sea, debe sufrir las consecuencias de su reprobable conducta.*"[65] (Énfasis suplido).

### III.

El peticionario alega que el TPI-Aibonito cometió siete (7) errores. En cuanto *al primer error*, alega que en el caso de epígrafe no existe sentencia final y firme. Para ello, arguye que el Foro Primario no reconoció que este Tribunal haya revocado su sentencia del 21 de junio de 2002. *No le asiste razón.*

Una vez emitida la *"Sentencia"* aludida del año 2005 del Tribunal de Apelaciones, el TPI-Aibonito emitió una *"Resolución"* el

---

[65] *Correa v. Marcano,* 139 DPR 856, 863 (1996). (Opinión concurrente, Sentencia).

5 de febrero de 2007, en la que dispuso textualmente que *"el Tribunal de Apelaciones revocó la Sentencia de este Tribunal del 21 de junio de 2002"*, y procedió a establecer una serie de instrucciones con el fin de *"dar cumplimiento al mandato"* de este Tribunal.[66] Es decir, el Foro Primario no solo reconoció que la sentencia aludida en el error quedó revocada, sino que llevó a cabo actos afirmativos, con el fin de remediar la misma y adjudicar la controversia.

En su *segundo y tercer señalamiento de error*, el apelante alega que el Foro Primario incidió al violar su debido proceso de ley, al no permitirle presentar evidencia, defensas, un informe pericial, reconvención y demanda contra co-parte. En el *sexto señalamiento de error*, alega que el Foro Apelado no fue diligente al asegurar el cumplimiento de los mandatos y órdenes de este Tribunal y del TPI-Aibonito, ni revisar los documentos sometidos por los apelados. *No le asiste razón.*

Hernández-Reyes nos plantea que se violentó esta garantía constitucional en la vertiente procesal. Según nos argumenta, estas infracciones al debido proceso de ley impactan su derecho a la propiedad, y la alegada negligencia del Foro Apelado al supervisar el cumplimiento de lo debido por parte de los apelados también. Sin embargo, este Tribunal considera este planteamiento desacertado en la forma y manera que los apelantes expusieron y litigaron sus posturas durante treinta (30) años.

Más contundente aún, los reclamos amparados en el debido proceso de ley de estos errores llevan años prescritos. Los apelantes no pueden continuar trayendo a la atención de las maquinarias judiciales reclamos que no plantearon a tiempo, o que traídos, no prosperaron. Su inacción para solicitar revisión no le autoriza en derecho a continuar relitigando asuntos ya adjudicados o prescritos.

---

[66] Apéndice del recurso, pág. 109. (Énfasis nuestro).

Por otro lado, como *cuarto señalamiento de error*, plantea Hernández-Reyes que el TPI-Aibonito se equivocó al ordenar el cierre administrativo del caso. Entendió el apelante que, al así hacerlo, la controversia no quedó adjudicada de manera final y firme. *No le asiste razón.*

Harto conocido es que en nuestro ordenamiento jurídico el nombre no hace la cosa. *Cordero Vargas v. Pérez Pérez,* 198 DPR 848, 868 (2017); *Borschow Hosp. v. Jta. de Planificación*, 177 DPR 545, 567 (2009); *Meléndez Ortiz v. Valdejully*, 120 DPR 1, 24 (1987); *Comisión Servicio Público v. Tribl. Superior*, 78 DPR 239, 246 (1955). Este principio ha sido sostenido por nuestro Alto Foro durante más de cincuenta (50) años. Id. Es decir, en nuestro ordenamiento jurídico, el nombre con el que se intitule algo, no nos obliga circunscribir ese objeto o documento al epíteto con el cual se le identificó. Bien lo expresó nuestro Tribunal Supremo, cuando, ampliando en el conocido principio de que el nombre de algo no hace la cosa, estableció lo siguiente: "se puede hacer caso omiso a los títulos de los recursos y considerarlos como corresponda". *Cordero Vargas v. Pérez Pérez,* supra, pág. 868.

La *"Resolución"* que ordenó el cierre administrativo, dispone que el mismo sería un "archivo definitivo de la presente causa de acción CON PERJUICIO".[67] La letra de este dictamen es clara e inequívoca. La causa de acción en el caso de epígrafe quedaría adjudicada. Más aún, especificó el Foro Primario que el archivo sería con perjuicio, impidiendo así que el caso recobrara vida.

El cierre fue declarado con perjuicio, ya que el Foro Primario dio cumplimiento al mandato del Tribunal de Apelaciones de la sentencia del 30 de diciembre de 2005.[68] El mismo consistió en instruir a las partes a cumplir con lo pactado en el contrato de

---

[67] Apéndice del recurso, pág. 1181.
[68] KLAN0200906.

opción del año 1993. Además, ordenó que estas cumplieran con sus respectivas responsabilidades para lograr la aprobación de la segregación de OGPe. Según detallamos en la exposición de derecho y argumentaremos próximamente, las escrituras de compraventa en cuestión fueron finalmente otorgadas conforme a derecho.

Con relación al *quinto señalamiento de error*, alega el apelante que el Foro Primario abusó de su discreción al imponerle una sanción de quinientos ($500.00) dólares, mediante una *"Orden"* del 31 de agosto de 2015. *No le asiste razón.*

Lo primero que señalamos es que Hernández-Reyes solo alegó que el TPI-Aibonito incidió en su discreción, pero no explicó de qué manera la sanción fue irrazonable o abusiva. Es decir, no nos puso en posición para evaluar su señalamiento.

Sin embargo, surge del expediente que el apelante: solicitó al Foro Primario que reconsiderara la misma el 23 de septiembre de 2015;[69] el Foro Primario concedió término para que los demandantes presentaran sus posiciones con relación a la reconsideración;[70] Puerto Rico Farm Credit así lo hizo el 12 de octubre de 2015;[71] el TPI-Aibonito le concedió un término adicional al apelante para mostrar causa por la que no se debía denegar de plano su solicitud de reconsideración;[72] los apelantes cumplieron con este último término;[73] los apelados finalmente presentaron su oposición a la reconsideración el 15 de febrero de 2016;[74] y el TPI-Aibonito finalmente atendió la solicitud de reconsideración a la multa en cuestión el 23 de febrero de 2016 y la declaró "No Ha Lugar".[75]

---

[69] Apéndice del recurso, pág. 486.
[70] *Id.* pág. 563.
[71] *Id.* pág. 564
[72] *Id.* pág. 568.
[73] *Id.* pág. 572.
[74] *Id.* pág. 575.
[75] *Id.* pág. 586.

Habiéndose vencido el término para una nueva reconsideración en marzo de 2016, el 25 de abril de 2016, mediante *"Moción Informativa"*, la parte apelante volvió a solicitarle al Foro Primario que retirara las sanciones que le impuso.[76] Mediante *"Orden"* del 3 de mayo de 2016, el Foro Apelado determinó que no tenía nada que proveer.[77] No surge del expediente ante nos que el apelante haya recurrido a otro mecanismo judicial que se justifique en derecho, para oponerse a ella. Queda meridianamente claro que cualquier revisión a la imposición de la sanción está prescrita.

Como *último señalamiento de error*, el apelante nos arguye que el Foro Primario se equivocó al ordenarle al alguacil a firmar las escrituras de compraventa, en el caso de que los apelantes se negaran a ello. *No le asiste razón.*

Como mencionáramos previamente, las Reglas de Procedimiento Civil, supra, proveen para que el Tribunal pueda ordenarle a un tercero que firme documentos y escrituras, en el lugar de una de las partes de un caso ante su consideración, que esté incumpliendo.

Luego de estudiar de manera sosegada el expediente en autos, justipreciamos que la firma de las escrituras correspondientes se atrasó por años, de manera innecesaria, porque la parte apelante se rehusaba a aceptar cualquier directriz, por más mínima que fuera, y se negaba a cooperar con la otra parte y el proceso ordenado por el Tribunal lo que forzó al foro primario a tomar dicha determinación en aras de darle cumplimiento a los mandatos de esta *Curia*.

**IV.**

Por los fundamentos que anteceden, *confirmamos el dictamen del Foro Apelado.*

---

[76] Apéndice del recurso, pág. 592.
[77] *Id.* pág. 604.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones